May it please the Court, my name is Philip Chabot. On behalf of the law firm of McCarthy, Sweeney, and Harkway, I represent the appellant in this action, the Court of Avista, excuse me, the Court of Seattle, Washington. I would like to reserve half of my time, ten minutes, for rebuttal, particularly in view of the number of respondents who I believe will be speaking separately. This is an action, as you know, to recover damages based on violations of the Sherman Act, the Bracketeer-Influenced Corrupt Organizations Act, and state statutory and common law actions for fraud, unfair business practices, and breach of contract arising from the sale of electricity during the Western Energy Crisis of 2000 and 2001. This Court is certainly no stranger to the facts. We have had a couple of those cases, and in previous cases, similar cases such as this and claims such as this have been dismissed based on the Foul Rate Doctrine, the Doctrine of Field Preemption, and the Doctrine of Conflict Preemption. Let me start with field preemption for the moment. You have another petition for review pending before this Court, right? Yes, we do, Your Honor. On the fur quarter. Yes, we do, Your Honor. And you're asking in that petition for review for us to find that FERC didn't do its job in determining whether the rates were just and reasonable. Why doesn't that case have primacy over this? How can we have two, or there certainly is a possibility of two inconsistent decisions, and doesn't that really get, kind of put the field preemption doctrine into sharp focus? Actually, Your Honor, I don't believe that there is a basis for conflicting decisions. The basis of the Puget Proceeding to which you refer, DACA DO-0110, before FERC, is whether the rates charged by all of the customers, excuse me, of any transaction in the Pacific Northwest during the period December 19th through June 20th, December 19th of 2000 through June 20th of 2001, were unjust and unreasonable. It does not address the question of whether or not the conduct of these Respondents violated the antitrust laws. The most that can come out of the FERC decision is a finding that, yes, the rates one of two things. Either the rates were unjust and unreasonable under the Federal Power Act, and there may or may not be a refund, because part of what's at issue in the Puget case is whether or not the Commission has authority to exercise discretion in that regard, in which case the parties are directed to comply with the Federal Power Act, or there's a finding that there was no violation of the Federal Power Act. Well, let's assume the latter. Let's assume that our panel says that these rates were just and reasonable. What does that do to your Sherman Antitrust Act claim? The finding that these, excuse me, that you find that in. Right. Let's say our other panel decides that the rates were, in fact, or the rate design was just and reasonable. Doesn't that eviscerate all of your State law and Federal law statutory claims? To make that finding, Your Honor, you would have to make a finding which we think is impossible based on the facts.  That's what we call a hypothetical question. That's right. Which is that those rates were, in fact, filed and approved. Right. But if our other panel concludes that they were filed, in fact, that FERC complied with all the statutory proceedings and that the filed rate was just and reasonable, doesn't that eviscerate your claims in this case? No, it does not, Your Honor. Because, again, the rates that were being charged exceed the maximum permissible. But that assumes the answer. It doesn't. So how do we get out of this endless circle? I mean, we've got case law that has already held that the filed rate doctrine applies because market-based rates are rates within the meaning of the Federal Power Act. And if you take Judge Thomas' hypothetical and another panel of our court rejects your argument that the rates were unjust and unreasonable, I don't see what's left of your case. So when the unthinkable occurs, you're out of court. Your Honor, it's our position that the decision in Puget, at best, cannot say whether the that the rates charged as a result of anti-competitive conduct. In other words, Puget cannot best say that the rates that were collected. It's difficult for me to go. I know. This is so unthinkable. It's in a sense a timing issue, Your Honor. But that's a key issue here in terms of, I mean, if the FERC proceeding is ongoing and the rates are at issue there, and you've made the arguments that are pretty close to the arguments you made in this case, is that the rates in the Northwest exceeded the maximum price. And that issue is before the other panel that has this. I mean, if I read your brief in the other case this morning, and that's what you argue, isn't it? You argue other things, but that's one of the things you argue. That is definitely one of the things that's argued. Yeah. So it seems to me, I mean, to go back to where I started with, that leads me to wonder whether or not the remedy is FERC related and not state law related because to determine whether or not you have a cause of action in this case depends on the determination of whether or not the rates are just and reasonable. And if that is true, then you're preempted. You're not right. Actually, I disagree with that formation of the question. That's why I asked the question so you knew what my concern was. Right. The question here is not whether these rates were just and reasonable. That is a FERC question. The question here is whether the rates are anti-competitive. Right. But if in determining whether the rates are anti-competitive, a critical component of that is whether or not the rates are just and reasonable, then I think field preemption applies. Tell me why it doesn't. And I misspoke, Your Honor, because it's not so much the rates because the price. Oh, the rate design. And the price here, and that's our whole argument, is that the price here is inconsistent with the rates. The rates that were allowed were market-based rates. And market-based rates have, by definition, a cap of the market clearing price. These rates exceeded the market clearing price. But you're still at your remedies. I mean, if you succeed in your FERC litigation, you get a refund, correct? We get a refund. We don't get treble damages. Right. The remedy is different. Sure. How do you respond, Mr. Chabot, to the concern that we've expressed in our prior opinions that what you're really asking the Federal District Court to do is to determine what the optimum rate should have been in order to measure the damages that you now want us to treble? And why doesn't that run flat up against the problem that we've identified, that it's FERC who sets those rates, not Federal District judges? Because an implicit part of the market-based rate structure, going back to 1989 when they were first implemented, was that there is an inherent cap on those rates. It's not a license to charge anything. No, no, no. I understand that. But the question I'm asking you is really one of who decides. And one of the themes that I see running through our cases is that we're all pretty well convinced that it's a bad idea to have Federal judges do what Congress created FERC to do. There is absolutely no question that the Federal Energy Regulatory Commission has the exclusive jurisdiction to establish the rate. And we believe that they've done that consistently by saying the upper limit to market-based rates is the market clearing price. But you're still asking as the remedy, if we allow your antitrust action to proceed, somebody, presumably a well-instructed jury and or a Federal judge, will have to decide what the difference is between the FERC-approved rate and whatever the rates were that were charged. And that seems to run smack into the problem that we've identified. Again, Your Honor, the market clearing price is a factually determined figure. It is not a hypothetical rate. And it is not the price that was charged here. I think what Judge Tolman is asking you to answer is that in order to calculate damages, you have to compute a hypothetical rate and compare that with what was charged. If you're saying the maximum you're going to ever claim in this case is the market clearinghouse price, then that's one thing. Is that what you're saying? You're not going to put on expert testimony to say that the fair and just rate should have been X? Oh, no. No. Our position from day one has always been that the reason that these rates are the prices charged are evidence per se of anticompetitive conduct is because they exceeded the market clearing price. Let's get right to it. No. Our damages, the baseline of our damages is the market clearing price. All right. Let's talk about that. And I'm sorry to interrupt you, but our time is limited. The market clearing price is based on the spot market in California, right? I mean, that's your measure of damages, which is an auction market. It's not a bilateral contract market. Why do you say the markets are the same? Because FERC has held that the markets are the same. FERC has held that it's a single market. Well, it's a single market. I understand what you're saying on that. But in terms of your argument here, it's awfully difficult to compare bilateral transactions with an index price, as the rate design was approved in this case, with the California market clearing house price. It's because those prices set the price throughout the market. The definition of a single market is the ability of the market to clear at the same price. At least one of the economic definitions is that the market price will be the same throughout. We're talking the spot market here in the California clearing house price, and I realize that by definition those prices ought to be higher, and I can understand why your client is irritated about the prices. But the market you're talking about in Pacific Northwest is fundamentally a different market, isn't it? It's a – it operates under different rules. But, again, FERC itself has found that it's a single market and that prices should be consistent throughout that market. Then why did they deny relief on the grounds that there were bilateral contracts involved? That was one of the – they had nine bases upon which to – Well, let's just take that one. I mean, as I understand the ruling, and I don't purport to be an expert in this area by any means, but as I understand what FERC said, it's a different market because of the fact that the manner in which electric energy is procured is done under bilateral contracts as opposed to these spot markets. That's what the administrative logic said. That wasn't what the commission itself said. But they denied relief, right? The commission denied relief based upon nine reasons, but the bilateral nature of the markets wasn't one of them. I think FERC basically was looking at a situation in the Puget case in which, again, without allegations of fault, there was an attempt to do what is being done in California. And one of the things that they were very concerned about is the fact that so many transactions in the Pacific Northwest, apart from being bilateral, but more importantly because bilateral – the nature of the contract shouldn't determine what's the just and reasonable price. It shouldn't determine whether the price exceeds the market clearing price. They had many, many contracts involving government entities, which for some reason or other, unlike what they did in California, they said they couldn't assert jurisdiction over in the Pacific Northwest. That was one major reason, and they thought that that would be inequitable. They noticed that – they pointed out that it was municipalities for the most part who were seeking relief, and they thought that because they couldn't exercise jurisdiction to make them give refunds, that would be inequitable. I don't think that – again, there was a hodgepodge of reasons, but the fact that they were bilateral contracts really wasn't one of the nine that was identified so much. They really – though your complaint gets down to one of rate design, doesn't it? You're complaining about the rate design of this particular rate, which is different from the rate design in the California markets. I mean, the California markets were market-driven in a sense of where FERC established the market. There was, of course, this single-price auction clearing proceeding price established. It's a centralized market, unlike the one in the Northwest. And the key to regulating that, as we said in Locke here, was managing the market, making sure that there's reporting. Here, if you're talking about this rate design, unless I've misconstrued it, you have a lot of fixed components and then you have an index that's driven, I grant you somewhat, by the market price in California because it's a market index. But let's say they use the CPI. Wouldn't that be permissible? You're asking this question about many components. The driving force on this rate, this was a – it was a long-term contract, but its energy price was based on the Cobb short-term market price, okay? That rate, that price, as consistent with Locke here, was a price that was never subsequently filed in quarterly reports. Right. I mean, this is a different – this is an entirely different rate design. I mean, as I understand the rate design of this one, there was no intention of ever filing the market reports that were required in Locke here, right? I don't believe that's correct at all, Your Honor. The basis for the whole authority to collect this rate was the blanket market-based rate authority. And the market-based rate authority required continuation of two circumstances, one that the – or several circumstances, but two of the important ones for this case, is that the bearer of that authority could not exercise – did not have then and could not in future exercise market power, which, again, is measured by FERC, is whether or not you have the capacity to charge a price in excess of the market-clearing price, and the requirement that you file the quarterly reports. In this case, we're not complaining about how FERC set the rate or the contract to which we agree. What's happened here is that the only authority that any of these sellers had was to charge within the boundaries of the market-based rate authority, which has as its cap the MCP. Roberts. I understand. Keep going. And so it's not a question of how that rate was designed. It's the virtue of the fact that this price that was charged exceeded the MCP, which could only have occurred as a result of the exercise of market influence and market power. And it never – there's – so it was never a filed and approved rate. And Lockyer confirms that because there was never subsequent quarterly filings. But doesn't our prior case law reject that argument? Your Honor, your prior case law doesn't raise the question. No one ever – even though it isn't based on costs as it used to be. What you – what was – what has been decided, we believe, by the Snohomish Decision Team at Snohomish Harbor was that the commission had the authority to impose market-based rates and that such rates were filed and approved under the Federal Power Act. Lockyer says, we believe, that that is – I'm curious. I'm all ears. That that is only – that that is only true so long as you meet the Farmers Union requirement, which is you have subsequent enforcement, which comes back to the farm. Right. But Lockyer was a FERC enforcement case. Lockyer was a FERC enforcement case. Right. That's absolutely correct. There's nothing in Lockyer that says you have a private antitrust remedy based on market power. Of course, there's nothing that says you don't, but it's hard to reach. Not in Lockyer. No. It's a question of – we believe it's a permissible inference from Lockyer that if, in fact, these prices, the prices charged which exceeded the market clearing price, were not subsequently filed on a quarterly basis, they were never filed. And if they were never filed, FERC can't even have implicitly approved them. They don't meet the requirements for a filed rate. They also don't meet the requirements for a filed rate because it was a price that was inconsistent with the approved rate. The approved rate was what you had authority to charge under the market-based rate authority, which was capped at the market clearing price. Well, I think Lockyer says rather clearly you can still have a market-based rate that's filed. Certainly. It was about enforcement authority. To enforce the – Certainly. And what the argument is, you certainly can do that. The point in this case is they haven't done that. They've charged – they haven't filed their quarterly reports, which means under Lockyer that they weren't filed. And they've charged in excess of the only authority that they have, the only rate the FERC has ever had on file and approved, which is the market-based rate authority which has its cap at the market clearing price. We've exhausted your time with our questions. Yes, you have. We will give you some time for rebuttal. Thank you very much. So let's hear from your opponents. Do you have a division of time? Yes. My name is Gordon Erspommer. May it please the Court. I'm representing TransAlta Corporation in connection with this appeal, but I'll be speaking on behalf of all the defendants. Unless some issues specifically come up, I would expect a breach of contract issue. I want to cut to the chase at the very beginning because I think there's a threshold issue before the Court that has actually been raised in some of your questions to counsel for appellants. I think it's important to identify in this case what exactly is the filed rate that we're talking about because there's quite a bit of confusion on that issue, I think, in the briefing. And the positions of the appellants and the appellees are quite different on that issue. I think the primary level in which the filed rate doctrine applies in this case applies to the contract between Puget and the court, and that is in the record. And that contract, contrary to counsel's statement and the inferences you might drop in the brief, does not implicate in any way the market-based rate authority. And in our request for judicial notice, we appointed you to the filings at the FERC to make that quite clear. The POS, Port of Seattle Wholesale Contract, was specifically approved by FERC as a settlement of a lawsuit in, I believe, 1997, long before the energy crisis was created or happened. And FERC expressly found that that contract and the rate schedule that went with it were just and reasonable and in the public interest. It was not entered into pursuant to the Puget's market-based rate authority. It was specifically approved by FERC. So it is incorrect to say that there is even a market-based authority issue with respect to that contract. At the same time, there's no reporting issue with respect to that contract either, because the contract and the rate it contained and the rate schedule was specifically approved by FERC. There is and can be no market reporting issue with respect to that contract. If that does not conclude the matter, and I think it likely does in light of the fact that the complaint itself, in paragraph 61, only seeks damages based upon the FERC contract, the contract with, between the port and Puget. That is the only measure of damages alleged in the complaint that relates to that contract. And the comparison between the contract rate and the rate that would have prevailed, allegedly, but for the defendant's misdeeds. But if it doesn't. Well, I gather, I mean, as part of the contract, there is a market-based component to this extent that the index is included, right? I'm turning to that exactly next. The second level that you might analyze the question of market-based rates does relate to that. And that's where all the money is. I mean, the difference of opinion on what ought to have been charged is based on the application of the index, right? I think the court can and should dispose of this case based upon the first level of argument, because they are challenging the file rate approved by FERC in the contract. By any means, and all the cases say that that rate cannot be disturbed. It has been approved by FERC and is just and reasonable. But I will get to the second level. The complaint could be read also as challenging the market-based rates of all the companies that sold power into these bilateral markets that comprise the index, the Mid-C Index. And by saying that that rate, by saying that that index was too high, they necessarily are challenging each rate that went into the index. And that does involve the market-based rate authority of the defendants. Now, with respect, however, to those rates, they not only had market-based rate authority from FERC, all those contracts were entered into pursuant to the WSPP tariff, which is yet another filed rate. And under the WSPP tariff, the FERC has pre-approved the contract form, and it's what we call an umbrella contract. And so they necessarily are also challenging the WSPP tariff. And in this respect, it is also important for purposes of the filing requirements. And I know, Judge Thomas, you're quite aware of those filing requirements because of Lockyer v. FERC. But what you may not be aware of is that there's never been an issue with respect to the reporting done by the WSPP with respect to WSPP contracts, which are the bilateral contracts used for transactions in the Pacific Northwest. There not only has not been an issue raised at FERC with respect to that, it has been specifically excluded from the Lockyer proceedings because all parties acknowledged that the WSPP filings, did conform to the reporting requirements by listing price, date, amount, et cetera. And that is, you can find that at 99 FERC, paragraph 61, 247. And then what does the, those are the two levels of the filed rates, but. Right. But let me stop you there, though. I mean, the argument in this case is not to, as I understand it, is not to quarrel with any of what you've just said, but to say that the companies conspired together to, in a fashion that manipulated the index and therefore artificially increased the price by operation of the tariff. And therefore, it has nothing to do with the filing rate at all. It was from their exercise of monopoly power that they were able to essentially jack up the index and therefore allow prices to be charged in excess of that involved in the spot market. Well. I mean, that's, that's. That is the argument. But I think that argument is precluded by Square D, the Stanislaus case in the Ninth Circuit, and every antitrust case that has been decided based on the filed rate doctrine. The filed rate doctrine precludes even Federal antitrust claims which seek to deviate from the filed rate. And if you look at the complaint, this is a classic case for application of the filed rate doctrine. I understand your argument perfectly. I think what his argument, what I would like to address is, is there a case to be made that there is a separate antitrust cause of action for manipulation of an index that would be, that has nothing to do with the filed rate because the rates, they say, well, there's nothing wrong with the approval of the index itself. But if through the exercise of monopoly power, the fact of how the index operates has become manipulated, then there may well be an antitrust. I don't believe there is for two reasons. One, based upon the first level of argument based upon the contract itself being approved by FERC containing the index component. But secondly, the market-based rate authority granted by FERC with respect to all the sales that comprise that index. And if you were to challenge, by filing an antitrust case and seeking damages, you are in effect challenging every rate that comprises the index of each of those cases. But let me jump to what the appellants urge is the filed rate. They urge that the filed rate is not either of the two things that I just discussed, but rather something that we might call an alternate rate. And, in fact, they go so far as to claim in their brief that they are enforcing a filed rate, a, quote, filed rate. I put that in parentheses. And the court want, I mean, the appellants want a court to substitute for the rate specified in the contract a remedy that is still incomplete at FERC with respect to a different market, the California market, a different types of transactions, which are spot transactions versus bilateral transactions. And, by the way, counsel I believe misspoke when he said that the FERC with respect to the Pacific Northwest proceeding did not rely upon the bilateral versus the spot market distinction. If you look at the decision, they expressly relied upon that and, indeed, emphasized it to a great degree in the decision on rehearing. This is part of the strategy that the court has had all along, both at FERC and here, to try to conflate the California market with the Pacific Northwest market based on bilateral contracts. And this is an effort that FERC, in the decision denying rehearing, said, quote, makes no sense. It makes no sense because the California market is a centralized market, as you indicated in your question, where there is a market clearing price, where supply meets demand, where the pair of the supply and demand. In theory, that's the market works for. In a bilateral contract, you're getting on the phone usually from a trading desk and say, hey, I want to buy some power, or you're negotiating a specific contract between a buyer and a seller. And as FERC has repeatedly found, and there's no basis for questioning this, FERC has repeatedly found that they're completely different markets. And the flaws in the California market they had identified with the centralized market, such as the single price auction structure and other flaws in the market design that led to unreasonable prices, do not apply to the bilateral market. And so this has been addressed repeatedly by FERC. It was addressed in the California refund proceeding, first of all. It was addressed secondarily in the Northwest proceeding, which you alluded to in your question, Judge Thomas. It was addressed again in rehearing. And this brings up a lot of issues with respect to conflict preemption, in addition to the filed rate doctrine issues. But the important thing for the filed rate purposes is that this market clearing price construct that counsel is trying to rely upon is not a filed rate at all. It simply is not a filed rate. And it is not a, as he describes it, the baseline for judging the pricing of bilateral transactions. There is no lot of that effect. In fact, there is no case that says you can use a rate from another case or a remedy from another case in connection with an argument to avoid the filed rate doctrine. Indeed, the cases are all to the contrary. If you look at, for example, the H.J. Inc. case, which is frankly a much closer case than is this case for applying a different rate. H.J. Inc. is an Eighth Circuit case where the plaintiff tried to apply a later approved rate as a measure of damages, which was lower than the contract rate. And the Eighth Circuit said you can't even do that. You have to use the filed rate. And here the court is attempting to rely and to try to describe as a, quote, filed rate a remedy that is yet to be issued by FERC with respect to a different market, different type of transactions, and one that FERC has repeatedly rejected. Let me segue to a slightly different topic. Do you believe that the court has a FERC remedy for the, leaving aside trouble damages, do you think, do you believe that the court has a FERC remedy in this case for a refund under their theory? I have to answer that in two ways. I know you would factually contest it, but in theory. Yes, but I have to answer that in two ways. Had they acted in a timely manner, they probably would have had a complete remedy with respect to transactions in the Pacific Northwest. I don't know whether they did act in a complete, in a timely manner with respect to all the claims they would want to make in this case. Yes. I'm speaking more generically in terms of the right to a remedy in theory. I don't want any technical defenses. I think the Section 206 of the Act, the Federal Power Act, does, would provide a remedy to someone aggrieved if they follow the procedures in the Act and they could go to FERC and have your remedy. And I think they have raised at FERC the same issues that you see here. In fact, if you look at the briefs we put into the record in the request for judicial notice, they made exactly the same arguments that they made in this brief. You see the same kind of elusive language about the market clearing price and the same types of arguments all the way down the line as the arguments that they raised in this case. But to maybe anticipate a question from you, Judge Thomas, you asked counsel, isn't, aren't your rights really tied up in the appeal from that FERC decision in the Pacific Northwest proceeding, often called the Puget proceeding. I would suggest to the Court that regardless of the disposition of that case, which stands in a different procedural posture than this case because it's an appeal from a FERC decision, that this case has to be dismissed. And even if the court and the other appellants in that case win and the case is sent back to FERC, either way, this case cannot avoid dismissal because of the filed right doctrine. And with respect to the state causes of action, they're clearly preempted. And I don't want to spend a lot of time on that, but they're very clearly preempted by field preemption under the Court's prior rulings, including Snohomish and others precedent under the Supreme Court precedent. But even as to the Federal antitrust action, it's clearly covered by the filed right doctrine, which is applied in these cases. And I mentioned earlier square D in these other cases. The – but to wrap up, I think when you look at the filed right issue, I think it's very important for the Court to identify what the filed rights, the different levels of the filed rights at issue in this case. And there's – I don't think there's any way that the Court can challenge the rate in the Puget contract because it was specifically approved by FERC and there are no issues with respect to either reporting or market-based rate authority with respect to that contract. And the only claim for damages is the one that is asserted in paragraph 61. I want to address very briefly the question of amendment because this has come up in some of the cases, including Grace Harbor. The court has not, in any of its papers, either below or here, articulated any basis for amendment. As you know, there's authority for requiring parties to articulate a basis at least. And, in fact, some of the cases go so far as to suggest that you need to submit a proposed pleading as to how you would amend your complaint. You can look in vain through the briefs in this case, the two briefs filed by the Court, for any sign of possible amendment. And I don't think, for the reasons I've stated earlier, that any failure to report issue could be asserted here. And even if it could be asserted, that would be an issue for FERC, and I think that's what the Lockyer case stands for, is FERC does have authority in that area to address any issues of failure to file in a proper way. But even as to Grace Harbor itself, there was a very narrow avenue, potential avenue of redress that the Ninth Circuit said was available on remand, which was issues relating to contract formation. I don't think that's available to the court here, and the reason is, in Grace Harbor, the complaint, based upon lack of formation, was based upon theories of duress, mutual and unilateral mistake, having to do with the fact that the contract, in that case, was entered into during the energy crisis itself. And the mistakes that are alleged were due to whether the market was properly functioning, or whether there had been widespread manipulation of the market. In this case, this contract, the 1990, was entered into in 1997, and that was a pre-energy crisis complaint, and there are no parallel issues which would even form the basis for amendment here. The second reason is tied into the fact that this specific contract was approved as part of a settlement at FERC, a joint settlement, by the way, a joint application for approval of the settlement in 1997, I believe. And that is, the parties represented to FERC in that application, both expressly and impliedly, that they had a deal. They had a settlement agreement which contained a new wholesale power contract, later became a rate schedule. How can you challenge formation of a contract when you yourself have been party to a pleading at FERC in which you allege that we have agreed to a settlement? And there is a contract, i.e., the settlement agreement. I think you'd be judicially stopped from ever making such an argument. Now, Grace Harbor has never made a claim in this case that or tendered this issue as a possible basis for amendment. You're sitting here with essentially nothing in the way of a theory with respect to any possible amendments to the pleading. You said Grace Harbor. You meant the port. I'm sorry. I meant the port, yes. I just got a curiosity. Do you know what happened after the remand on Grace Harbor? I do, because I happen to represent the parties to that case. Well, tell me. The case after remand, Judge Whaley, who's sitting on all these cases, was assigned the case by the judicial panel, so that was Stage 1. Stage 2, we renewed our motion to dismiss based upon Grace Harbor, and that motion is under submission with Judge Whaley. It has not yet been ruled upon. However, Judge Whaley has issued an order asking the parties to address an issue as to whether he should refer that matter to FERC. And while that was pending, the parties agreed to a stay pending a mediation, which is going to happen next month. So essentially there's nothing really relevant in the subsequent history of that case. So the motion is based on primary jurisdiction, the referral to FERC? The motion to dismiss is based upon the referral to FERC. Well, the referral to FERC is basically based on the notion that since FERC will have to decide whether any damages can be awarded in any event, and the issue of damages is related or interrelated to liability, that the judge believes it would probably be appropriate for FERC to address both issues rather than have him reinvent the wheel on the question of market manipulation and the effect on the other formation issues. But he hasn't issued the order. He's just considering whether to do that. He issued an order giving the parties, either party, the opportunity to submit the issue to FERC. I see. And that deadline has not yet filed. It had come because it's been extended by virtue of the mediation. Okay. And unless there are further questions, I guess I see my time is running. Okay. Thank you. Thank you. I'll give you a couple minutes for rebuttal. Thank you, Your Honor. Just to address where your first question took us, Your Honor, with respect to conflict preemption. I did say field preemption. I meant to say conflict preemption. So thank you for subtly correcting me. That was part of what I was trying to resolve. But the basic issue, and I should have spoken about this earlier, is conflict preemption requires an actual conflict, not a hypothetical conflict. And while you raised a very good hypothetical question, my answer of timing, I think, is the appropriate answer, that we do not have a conflict preemption issue until we get to the point where we actually do have that actual conflict. The representation was made that the filing of WSBP transactions was never an issue. It certainly was in the Puget Proceeding. In fact, I remember a contentious discovery dispute over whether or not the WSBP filings were sufficient to comply with the requirements of the market-based rate authority. And, in fact, that's one of the reasons why the administrative law judge implemented a very complex process of secret filings of transaction data, because the transaction data could not be derived from the public record. And that is, if you've read the pleadings in connection with the Puget case, you'll definitely see that as a major dispute in the proceeding. And also, with respect to the argument that, again, that somehow that MCP, the market clearing price concept, only applies in California and only applied because California had a Kaizen PX. That's simply incorrect. The first market-based rate order in 1989 involving Citizens Power, a New England company, referred to the fact that they could impose MBR consistent with the Act because there was an implied cap. The Central Main Power case in 1991 noted that even under market-based rates, refunds would be available based on the costs if the amounts actually charged exceeded the costs of the seller. And, again, FERC's orders of June 19, 2001, in connection with the San Diego case, declared that the MCP was to be used as a price cap throughout the West. It drew no distinction between the Kaizen PX market in California, the Pacific Northwest market, or the markets in Arizona or Nevada or Idaho or Montana. Or Montana. To which it all applied. And it said that that was, again, because it was a single market, dictated by a common price in the interest of uniformity. For one second. What is your best case that would indicate that charging a price in excess of the exercise of market monopoly power? I'm trying to rephrase how you put it in your brief, and I'm not doing it very well. The best judicial decision? Yes. I don't know that there is one because I think it's actually a case of first impression. There are many instances of FERC in which they have, FERC itself, has indicated. And, in fact, it's throughout the San Diego proceeding, because that's how they were justifying the use of the MCP. And it's important to distinguish between the market clearing price and the mitigated market clearing price, which is what is still in the process of being identified in California, the market clearing price. Again, the economic theory is well-supported, and FERC discusses it in the San Diego proceedings, that no intelligent buyer, no responsible buyer, purchases above that price. And that you can only collect that monopoly rent, essentially, if you have an exercise market power. I think we have your argument at hand. Any further questions? Thank you very much for your arguments. It's an interesting case. I know we didn't get into all the matters raised in your briefs, but you can be assured that we will take those into consideration.
judges: Thomas, Tallman. Fitzgerald